MORRIS POLICH & PURDY LLP
David J. Vendler, Esq. (SBN 146528)
Email:    dvendler@mpplaw.com
1055 West Seventh Street, Suite 2400
Los Angeles, CA 90017
Tel.:   (213) 417-5100
Fax:    (213) 488-1178

MICHAEL R. BROWN, APC
Michael R. Brown, Esq. (SBN 65324)
Email:    mbrown@mrbapclaw.com
18101 Von Karman Avenue, Suite 1900
Irvine, California 92612
Tel.:   (949) 435-3888
Fax:   (949) 435 3801

LAW OFFICE OF JEFFREY D. POINDEXTER
Jeffrey D. Poindexter, Esq. (SBN 167854)
Email:    jeffrey@jdpoindexterlaw.com
2580 Catamaran Way
Chula Vista, CA 91914
Tel.:   (619) 271-2382
Fax:    (619) 568-3801

Attorneys for Plaintiffs RICHARD M. HORN,
MARIA GUREVICH,
and all others similarly situated

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD M. HORN, an individual and as Trustee of the Richard M. Horn Trust Dated June 16, 2003, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> BANK OF AMERICA, N.A., a national banking association, <br><br> Defendant. | CASE NO.: 12-CV-1718-GPC-BLM <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, INCLUDING THAT THE COURT: (1) DETERMINE THE SETTLEMENT AGREEMENT IS FAIR, REASONABLE AND ADEQUATE; (2) ENTER A FINAL APPROVAL ORDER; (3) APPROVE CLASS COUNSEL'S ATTORNEYS' FEES AND COSTS; AND (4) APPROVE THE NAMED PLAINTIFF CASE CONTRIBUTION AWARDS** <br><br> DATE;    April 11, 2014 <br> TIME:    1:30 PM <br><br> COURTROOM 2D <br> Honorable Gonzalo P. Curiel |

1
2
3
4
5
6
7

**[Filed concurrently with the Declarations of David J. Vendler, Michael R. Brown, Jeffrey D. Poindexter, Maria Gurevich, Richard M. Horn, Justice John K. Trotter (Ret.), Dr. Gary Lorden. Amanda Horn, Ivey Davis, Marcia B. McCall, and Peter K. Morrison**

8      Notice is hereby given that Richard M. Horn and Maria Gurevich ("Class

9   Representatives"), individually and as representatives of the classes of similarly

10   situated persons, will, on April 11, 2014, move pursuant to Federal Rule of Civil

11   Procedure 23(e) for orders: (a) determining that the Settlement Agreement is fair,

12   reasonable, and adequate; (b) entering the Final Approval Order and Judgment in the

13   form of Exhibit "E" to the Settlement Agreement[1]; (c) approving Class Counsel's

14   attorneys'   fees   award   and   (d)   approving   the   Named   Plaintiff   Case

15   Contribution/Incentive Awards.    The motion will be made at 1:30 p.m. in Courtroom

16   2D of the Edward J. Schwartz United States Courthouse for the Southern District of

17   California, 221 West Broadway, San Diego, California 92101.

18      The motion is made on the grounds that: (1) the time table for mailing the Class

19   Notice, receiving claims/exclusions, and lodging objections to the terms of the

20   settlement, as previously ordered in the Court's January 7, 2014 Preliminary Approval

21   Order (Document 53) was appropriate and has been fully performed; (2) the Class

22   Notice fairly apprised Class Members of the terms of the Settlement, including the

23   amount that would be requested for attorneys' fees and enhancement awards; (3) all

24   requirements for certification of a class action solely for settlement purposes are met;

25   (4)   the   settlement   is   in   the   best   interest   of   Class   Members;   (5) the   Class

26

27   _____
[1] Capitalized terms have the same meanings as in the Settlement Agreement
28   (Document 60-1).

12-CV-1718

Representatives' attorneys are experienced in complex litigation and have zealously and adequately represented the interests of Class Members in a non-collusive manner.

This motion is based upon this notice of the motion; the memorandum in support of the motion; the Declarations of David J. Vendler ("Vendler Dec."), Michael R. Brown ("Brown Dec."), Jeffrey D. Poindexter ("Poindexter Dec."), Maria Gurevich ("Gurevich Dec."), Richard M. Horn ("Horn Dec."), Amanda Horn ("A. Horn Dec."), Justice John K. Trotter (Ret.) ("Trotter Dec."), Dr. Gary Lorden ("Lorden Dec."), Peter K. Morrison ("Morrison Dec."); Ivey Davis ("Davis Dec.") and Marcia B. McCall ("McCall Dec."); and the [Proposed] Order Granting Joint Motion for Final Approval of Class Action Settlement, Attorneys' Fees and Case Contribution Awards.  The motion is also based on the pleading and papers previously filed with the Court, including the Settlement Agreement (Document 60-1 at p.7) and the Court's Order preliminarily approving the settlement (Document 63), as well as any oral argument of counsel, the complete files and records in the above-captioned matter, and such additional matters as the Court may consider, including plaintiffs' opposition to the objection of Susan House.[2]

Date: March 14, 2014                    MORRIS POLICH & PURDY LLP


                                       By: _/s/ David J. Vendler_____
                                            David J. Vendler
                                       Email:   dvendler@mpplaw.com

                                       Additional counsel on next page:

---

[2] Separately, plaintiffs are filing an opposition to the objection of Ms. House, including their request for the Court to strike that objection on the ground that Ms. House's objection has been filed for an improper purpose and by counsel who has been identified as a "serial objector" by multiple federal courts, including in this district. *Dennis v. Kellogg Co.*, 2013 WL 6055326, at *4, n.2 (S.D.Cal. 2013).

MICHAEL R. BROWN, APC
Michael R. Brown, Esq. (SBN 65324)
Email:   mbrown@mrbapclaw.com
18101 Von Karman Avenue, Suite 1900
Irvine, California 92612
Tel.:  (949) 435-3888
Fax:  (949) 435 3801

LAW OFFICE OF JEFFREY D. POINDEXTER
Jeffrey D. Poindexter, Esq. (SBN 167854)
Email:   jeffrey@jdpoindexterlaw.com
2580 Catamaran Way
Chula Vista, CA 91914
Tel.:  (619) 271-2382
Fax:  (619) 568-3801

Attorneys for Plaintiffs RICHARD M. HORN,
MARIA GUREVICH, and all others similarly
situated

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ....................................................................................... 1

II. PROCEDURAL HISTORY ........................................................................ 2

III. SETTLEMENT TERMS/VALUE ............................................................. 7

    A.  The Value of Amended 1098 Forms For Tax-Years 2010-2012 ............... 7

    B.  The Value Of Payments To Class Members To Offset Any Filing Costs Associated With Amending Tax Returns For Tax Years 2010-2012 ................................................................................... 9

    C.  The Value Of Damages Payable To Qualifying Class Members For The Bank's Incorrect Reporting Of Paid Deferred Interest In 2009, And For Which Amended Tax Returns Cannot Be Filed ............................................................................................................ 9

    D.  The Value Of Prospective Injunctive Relief ............................................ 10

IV. NOTICE OF THE SETTLEMENT WAS PROVIDED TO THE CLASS IN THE MANNER PRESCRIBED BY THE COURT IN ITS PRELIMINARY APPROVAL ORDER (DOCUMENT 63) ............................ 11

V.  THE SETTLEMENT MEETS THE LEGAL STANDARD FOR APPROVING CLASS ACTION SETTLEMENTS ......................................... 12

    A.  The Strength Of The Plaintiffs' Case ........................................................ 15

    B.  Settlement Is Appropriate In Light Of The Risks Involved And The Results Achieved ................................................................................. 18

    C.  Maintaining Class Certification ................................................................ 20

    D.  The Amount Of The Settlement And The Benefits To The Class Are The Product Of Hard Fought, Non-Collusive Negotiations And Warrant Approval ............................................................................... 20

    E.  The Experience And Views Of Counsel Favor Final Approval .............. 22

    F.  The Presence Of A Governmental Participant ......................................... 24

    G.  The Reaction To The Settlement Has Been Extremely Positive ............ 24

IV. CLASS COUNSEL'S REQUESTED LEGAL FEE OF $10.5 MILLION IS REASONABLE AND SHOULD BE APPROVED .................... 26

    A.  Class Counsel's Proposed Fee of $10.5 Million Is Supportable Under The Percentage Of Recovery Approach ........................................ 28

        1.  Results Achieved ............................................................................. 32

| | 2. | Risk of Litigation .................................................................. 32 |
| | 3. | Class Counsel Generated Huge Benefits Beyond the Cash Settlement Fund .................................................................. 33 |
| | 4. | Class Counsel's Relatively Early Settlement Was Greatly Beneficial to the Class ...................................................... 34 |
| | 5. | A Lodestar Cross-Check Validates the Requested Fee ................... 35 |
| V. | COSTS | ............................................................................................ 38 |
| VI. | ENHANCEMENT TO THE CLASS REPRESENTATIVE | .............................. 38 |
| VII. | CONCLUSION | ................................................................................. 40 |

12-CV-1718

1

## **<u>TABLE OF AUTHORITIES</u>**

2

<u>Page</u>

3

<u>**Cases**</u>

4

*Alberto v. GMRI, Inc.,*
   252 F.R.D. 652 (E.D.Cal. 2008) ................................................................. 13

5

*Barbosa v. Cargill Meat Solutions Corp.,*
   --- F.R.D. ----, 2013 WL 3340939 *11 (E.D. Cal. 2013) ............................ 14

6

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980) ................................................................................. 27, 29

7

8

*Centerior Energy Corp. v. Mikulski,*
   553 U.S. 1031 S.Ct. 2426, 171 L.Ed.2d 229 (2008) .................................... 16

9

*Chun-Hoon v. McKee Foods Corp.,*
   716 F.Supp.2d 848 (N.D.Cal. 2010) ........................................................... 25

10

11

*Churchill Village, LLC v. Gen. Elec.,*
   361 F.3d 566 (9th Cir.2004) ........................................................................ 25

12

*Class Plaintiffs v. Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ............................................................... 13, 14

13

14

*Cosgrove v. Sullivan,*
   759 F. Supp. 166 (S.D.N.Y. 1991) .............................................................. 37

15

*Curtis–Bauer v. Morgan Stanley & Co.,*
   2008 WL 4667090 *4 (N.D.Cal. 2008) ...................................................... 14

16

17

*Dennis v. Kellogg Co.,*
   2013 WL 6055326, at *4, n.2 (S.D.Cal. 2013) ........................................ 3, 24

18

*Dukes v. Wal-Mart Stores, Inc.,*
   603 F.3d 571 (9th Cir. 2010) ....................................................................... 14

19

20

*Eisen v. Porsche Cars North America, Inc.,*
   2014 WL 439006 *5 (C.D.Cal. 2014) .................................................... 25, 27

21

*Ferland v. Conrad Credit Corp.,*
   244 F.3d 1145 n. 4 (9th Cir.2001) ............................................................... 27

22

23

*Fox v. Vice,*
   —— U.S. ——, ——, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011) ................. 35

24

*Fraley v. Facebook, Inc.,*
   --- F.Supp.2d ----, 2013 WL 4516819 *1 (N.D.Cal. 2013) ........................ 14

25

26

*Garner v. State Farm Mut. Auto. Ins. Co.,*
   2010 WL 1687832 *8 (N.D.Cal. 2010) .................................................. 14, 24

27

28

*Glass v. UBS Financial Services, Inc.*,
331 Fed.Appx. 452 (9th Cir. 2009) ............................................................ 10, 29, 39

*Guam Soc'y of Obstetricians & Gynecologists v. Ada*,
100 F.3d 691 (9th Cir.1996) ................................................................................. 35

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1988) ........................................................ 14, 27, 28, 36

*Hartless v. Clorox*,
273 F.R.D. 630 (S.D.Cal.2011) ...................................................................... 27, 36

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ............................................................................................. 35

*In re Aremis Soft Corp. Sec. Litig.*,
210 F.R.D. 109 (D.N.J. 2002) ............................................................................. 17

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ......................................................................... 22, 28

*In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*,
778 F.2d 890 (1st Cir.1985) ................................................................................ 37

*In re Equity Funding Corp. of America Securities Litigation*,
438 F.Supp. 1303 (D.C.Cal. 1977) ..................................................................... 19

*In re Heritage Bond Litigation*,
2005 WL 1594403 *20 (C.D.Cal. 2005) ........................................................... 19

*In re M.D.C. Holdings Securities Litigation*,
1990 WL 454747 * 7 (S.D.Cal. 1990) ................................................................ 34

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ......................................................................... 13, 25

*In re Mercury Interactive Corp. Sec. Litig.*,
618 F.3d 988 (9th Cir.2010) ................................................................................ 27

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................ 37

*In re Oil Spill by Oil Rig Deepwater Horizon*,
295 F.R.D. 112 at fn. 40 (E.D.La. 2013) ........................................................... 24

*In re Pac. Enters. Secs. Litig.*,
47 F.3d 373 (9th Cir. 1995) ................................................................................ 28

*In re Rite Aid Corp. Secs. Litig.*,
146 F. Supp. 2d 706 (E.D. Pa. 2001) ................................................................. 37

*In re Toys R Us-Delaware, Inc.--Fair and Accurate Credit Transactions Act (FACTA) Litigation*,
295 F.R.D. 438 (C.D.Cal. 2014) ........................................................................ 38

12-CV-1718

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994).................................................................. 36

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir.1994)................................................................. 32

*Jacobs v. Cal. State Auto. Ass'n Inter–Ins. Bureau*,
   2009 WL 3562871 (N.D.Cal. 2009)..................................................... 39

*Johansson-Dohrmann v. Cbr Systems, Inc.*,
   2013 WL 3864341 *8 (S.D.Cal. 2013) ................................................ 28

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir.1998).......................................................... 13, 21

*Louie v. Kaiser Foundation Health Plan, Inc.*,
   2008 WL 4473183 (S.D.Cal. 2008) .................................................... 39

*Marshall v. Holiday Magic, Inc.*,
   550 F.2d 1173 (9th Cir. 1977)............................................................ 13

*McCurry v. C.I.R.*,
   133 F.3d 928 (Table) (9th Cir. 1997).................................................. 30

*Mikulski v. Centerior Energy Corp.*,
   501 F.3d 555 (6th Cir. 2007).............................................................. 16

*Molski v. Gleichi*,
   318 F.3d 937 (9th Cir. 2003).............................................................. 14

*Murillo v. Pacific Gas & Elec. Co.*,
   2010 WL 2889728 *10 (E.D.Cal. 2010)............................................. 22

*Nat'l Rural Telecoms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) .................................................. 13, 25

*Norwest Mortgage, Inc. v. Superior Court*,
   (1999) 72 Cal.App.4th 214 ................................................................. 17

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir.1982)........................................................... 14, 22

*Pelletz v. Weyerhaeuser Co.*,
   592 F.Supp.2d 1322, 1330 (W.D.Wash.2009)..................................... 39

*Presley v. Carter Hawley Hale Profit Sharing Plan*, No. C9704316SC,
   2000 WL 16437 *2 (N.D. Cal. 2000) ................................................. 39

*Rabin v. Concord Assets Group, Inc.*,
   1991 WL 275757 *1-2 (S.D.N.Y. 1991).............................................. 37

*Republic Nat'l Life Ins. Co. v. Beasley*,
   73 F.R.D. 658 (S.D.N.Y. 1977) .......................................................... 15

*Roberts v. Texaco, Inc.*,
   979 F. Supp. 185 (S.D.N.Y. 1997)..................................................... 37

*Rodriguez v. West Publishing Corp.*,
   563 F.3d 948 (9th Cir. 2009)............................................................ 13

*Schwarz v. Sec'y of Health and Human Serv.*,
   73 F.3d 895 (9th Cir.1995)............................................................... 36

*Singer v. Becton Dickinson and Co.*,
   2010 WL 2196104 (S.D.Cal. 2010) ................................................ 39

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
   904 F.2d at 1311 (9th Cir.1990)....................................................... 32

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003).................................................. 27, 30, 31, 38

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011)............................................................. 25

*Thieriot v. Celtic Ins. Co.*,
   2011 WL 1522385 (N.D.Cal. 2011).............................................. 32, 39

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir.1993)........................................................... 14, 32

*United States v. Hicks*,
   947 F.2d 1356 (9th Cir.1991)........................................................... 30

*Van Vranken v. Atl. Richfield Co.*,
   901 F.Supp. 299 (N.D. Cal. 1995) ................................................ 36, 39

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002) ............... passim

*Weeks v. Kellogg Co.*,
   2013 WL 6531177 *29 (C.D.Cal. 2013)........................................... 10

*Weiss v. Mercedes-Benz of N. Am.*,
   899 F. Supp. 1297 (D.N.J. 1995) ..................................................... 37

*Wershba v. Apple Computer, Inc.*,
   91 Cal. App. 4th 224 (2001)............................................................. 36

*Widrig v. Apfel*,
   140 F.3d 1207 (9th Cir.1998)........................................................... 35

*Williams v. MGM-Pathe Communications Co.*,
   129 F.3d 1026 (9th Cir. 1997).......................................................... 29

*Young v. Polo Retail*,
   LLC 2007 WL 951821 *8 (N.D.Cal. 2007)....................................... 29

*Zimmerman v. Cambridge Credit Counseling Corp.*,
   322 F.Supp.2d 95 (D.Mass. 2004) ................................................... 15

*Zimmerman v. Cambridge Credit Counseling Corp.,*
   409 F.3d 473 (1st Cir. 2005) ........................................................ 16

**Statutes**

26 U.S.C. § 501(c)(3) ................................................................... 16

28 U.S.C. § 1715 .......................................................................... 24

26 U.S.C. § 6050H ...................................................................... 1, 7

26 U.S.C. § 6511 ................................................................ 2, 3, 9, 18

26 U.S.C. § 6721 ...................................................................... 5, 16

26 U.S.C. § 7434 .......................................................................... 16

Fed.R.Civ.Proc. 23(b)(2) and (b)(3) ............................................... 7

Fed.R.Civ.Proc. 23(c)(2)(B) ......................................................... 11

**Other Authorities**

Fed. Judicial Ctr., Manual for Complex Litigation, § 21.633 (4th Ed. 2004) .............. 13

**Regulations**

26 C.F.R. § 1.6050H-1 ................................................................... 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

For almost all owners of real property, the mortgage interest deduction amounts to thousands of dollars per year, and is their largest single deduction. The way both borrowers and the Internal Revenue Service ("IRS") determine how much mortgage interest has been paid during a given year is from the lender-issued Form 1098. (Internal Revenue Code § 6050H requires lenders to report to the IRS and to their borrowers the amount of mortgage interest received during a given year if that amount is over $600). Until this lawsuit, Bank of America, N.A. ("Bank") was intentionally excluding from its interest reporting any payments of interest that its borrowers had previously deferred paying under their Option Arm loans.[3]

In fact, between 2009 and 2013, the Bank did not report $1,548,790,381 in mortgage interest that had been actually paid by Class Members, resulting in their losing the potential to deduct those payments on their tax returns. ("McCall Dec."), ¶ 12. As a result of the Settlement in this case, the Bank has issued revised Forms 1098 to all Class Members reporting correctly the amounts of mortgage interest they

---

[3] An "Option Arm" loan provides borrowers with four (4) different payment "options" in any given month. The first "option" is to make a full payment of the principal and interest due under the note. The second "option" is to pay "Interest Only." A third "option" is to pay the "Minimum Payment," which may be, and often is, less than the interest then due on the note and can lead to "negative amortization." A fourth "option" is to make accelerated payments on a 15-year amortization schedule. The marketing objective of the "Option ARM loan" was to allow consumers to minimize their monthly payment so that they could "afford" to purchase a home based upon their available cash flow. Thus, consumers with these loans overwhelmingly chose the "Minimum Payment" option. This in turn led to them incurring "deferred interest" which was added to their loan balance. When this "deferred interest" was eventually paid back, Bank of America did not report those payments and treated it as a repayment of principal not reportable on Form 1098. This is the crux of plaintiffs' complaint – that their payments of previously deferred interest were repayments of mortgage interest that should have been reported on Form 1098 under 26 U.S.C. § 6050H.

1

paid in 2010-2013.  As a result of the Settlement, Class Members can now recover *the full amount* of their lost deductions for those years from the IRS.  As for 2009, by the time of the Settlement, the statute of limitations for filing amended tax returns (26 U.S.C. § 6511) had already expired making recovery of any lost deductions from the IRS impossible.  For this reason, the Settlement provides that Class Members can recover the vast majority of the value of their lost deductions for that year from the Bank.  Further, the Bank has promised as a result of this Settlement that it will report payments of deferred interest going forward unless otherwise directed by law. Additionally, the Bank has agreed to pay all expenses in connection with the Settlement including attorneys' fees, litigation costs, and costs of class administration.

In the aggregate, the benefit to Class Members from all prongs of the Settlement is estimated to be $223,219,012.  Lorden Dec., ¶¶ 9-14.  Because the Settlement is reasonable and (more than) adequate, Richard M. Horn and Maria Gurevich ("Class Representatives") seek this Court's final approval of the Settlement. They also seek the Court's approval of their counsel's attorneys' fee request – which amounts to less than 5% of the overall value being delivered to the class – and their own Case Contribution Awards.

## II.   **PROCEDURAL HISTORY**

On July 7, 2012, plaintiff Horn filed his complaint accusing the Bank of not reporting his payments of deferred mortgage interest payments (Document 1). Though the Bank had implemented its (wrongful) reporting policy in 2009, and even though the Bank's interest calculations had passed through the hands of hundreds of thousands of borrowers and *literally tens of thousands* of professional tax preparers, Horn's was the first complaint to challenge the Bank's wrongful and improper reporting.

On September 5, 2012, the Bank filed its first motion to dismiss (Document 7), vociferously denying it had done anything wrong and claiming that plaintiff Horn's complaint failed to state any claim.  Alternatively, the Bank contended that under the

doctrine of primary jurisdiction, Horn's complaint should be dismissed or transferred to the IRS for adjudication.

On November 20, 2012, plaintiff Horn filed a motion to amend his complaint (Document 14) to add plaintiff Gurevich as an additional class representative. Adding Ms. Gurevich to the lawsuit effectively mooted one of the principal arguments contained in the Bank's original motion to dismiss, namely that Mr. Horn had not suffered any damages because his loan was on a rental property and that owners of rental properties (according the Bank) are required to deduct interest as it accrues under the Original Issue Discount ("OID") rules. Thus, (again according to the Bank) the amounts appearing on his Form 1098s were irrelevant to his tax obligation.

Since Mrs. Gurevich's mortgage was secured by her principal residence, the Bank's OID argument did not apply to her. Realizing this fact, the Bank eventually stipulated to allowing the motion to amend making Mrs. Gurevich a party in exchange for plaintiffs' allowing the Bank to withdraw its then pending motion to dismiss so it could file a new and different one.

In November 2012, plaintiff's counsel invited the Bank to discuss settlement. Vendler Dec., ¶ 53-55. Plaintiffs' counsel's invitation for early settlement discussions was motivated by two factors. First, plaintiffs were hoping to convince the Bank not to continue its wrongful reporting for the then-soon-to-be-issued Forms 1098 for tax-year 2012. Second, and more importantly, plaintiffs' counsel were acutely aware of the immoveable 3-year statute of limitations for amending tax returns imposed by 26 U.S.C. § 6511. For each year that the case did not resolve, Class Members would forever lose their right to recover the value of their lost deductions from the IRS. This would make the case much more difficult to settle with the Bank, because plaintiffs' would have to look exclusively to it for recompense. *Id.* and at ¶¶ 56-57.

Plaintiffs' counsel knew that the best way to accomplish a settlement in this case was to have the IRS "fund" it. For tax-years where borrowers could still amend their tax returns, the Bank would only have to issue new Forms 1098 including the

previously omitted interest and borrowers could recover from the IRS 100% of the value of the deductions they lost due to the Bank's wrongful reporting. But once the statute of limitations passed for any given year, that tax-year would be forever closed and the Bank would be the only option for recompense. Plaintiffs' counsel also knew that unlike the IRS, which is obligated to credit 100% of the value of a lawful deduction, the Bank would likely not be willing to pay 100% of the value of the lost deductions in any settlement, but would insist on a significant "settlement discount." In short, this was the rare case where the longer the litigation lasted, the smaller the recovery would almost certainly be for the class – even though the Class Members' damages would be increasing. *Id.*

Unfortunately, the Bank initially rejected plaintiffs' counsel's early settlement entreaties and stood fast in its refusal to change its policy for tax-year 2012. In January 2013, it again intentionally issued its Forms 1098 that did not include payments of deferred interest. More importantly, its refusal to remedy its incorrect reporting allowed the statute of limitations to pass for amending returns for the 2009 tax-year, which was the first year that the Bank had implemented its incorrect reporting policy. *Id.* at ¶ 55.

On February 19, 2013, the Bank filed its second motion to dismiss (Document 25). This motion contended, among other things, that (1) IRS authority did not require the Bank to report payments of deferred interest on Forms 1098; (2) the IRS had exclusive enforcement jurisdiction over the Bank's alleged noncompliance with the Form 1098 reporting requirements such that plaintiffs' claims were not cognizable and therefore must be dismissed; (3) reporting on Form 1098 was a matter of federal, not state, law and the Internal Revenue Code did not provide any private right of action; (4) the doctrine of primary jurisdiction required the Court, at a minimum, to refer the issue of whether payments of deferred interest must be reported on Form 1098 to the IRS; (5) Plaintiffs appropriate remedy, if any, was through the IRS's administrative appeals process; and (6) all of plaintiffs' claims, namely their claims

for (a) breach of contract; (b) negligence per se; (c) negligent misrepresentation; (d) intentional misrepresentation; (e) unfair business practices, in violation of California's Unfair Competition Law; and (f) declaratory judgment failed to state a claim in their own right.

On the same day the Bank filed its second motion to dismiss, plaintiffs went on the attack by filing their own motion in which they sought declaratory judgment and injunctive relief. (Document 26). Plaintiffs then increased the pressure by filing an ex parte application to advance the hearing on that motion (Document 27) which was granted (Document 30).

It was this motion and the ex parte application that finally brought the Bank to the settlement table; the Bank understood that it could now no longer sit back and wait for the litigation to drone on. Rather, if the plaintiffs' motion was granted, chaos for the Bank could result both in terms of its IRS compliance and its own internal operations. (There are substantial penalties the IRS can impose for wrongful 1098 reporting.[4] Additionally, 1098 reporters are, in any event, under a legal obligation to correct any erroneous returns "as soon as possible.")[5]

In spite of the pressure brought to bear by the plaintiffs' motion, the parties' settlement negotiations were lengthy, spanning nearly 8 months.[6]  The parties'

---

[4] The Bank faced the potential under 26 U.S.C. § 6721 of suffering penalties ranging from $100 per return with a maximum of $1.5 million per year for negligent errors to "10 percent of the aggregate amount of the items required to be reported correctly" (with no per year limit) for mistakes done with "intentional disregard." Plaintiffs have contended all along that the incorrect reporting was done intentionally so as to minimize the income the Bank would have to pay taxes on by calling repayments of interest (which is income to the Bank) repayments of principal (which is not income to the Bank).

[5] See, e.g. 2014 General Instructions for Certain Information Returns (Forms 1097, 1098, 1099, 3921, 3922, 5498, and W-2G)" published by the IRS and found at http://www.irs.gov/pub/irs-pdf/i1099gi.pdf

[6] The negotiations were conducted as the briefing was completed on the parties' cross motions (e.g. Documents 31-34).  Thereafter extensions of the hearing date were

settlement efforts were supervised by well-respected mediator, the Hon. John K. Trotter, (Ret.) ("Justice Trotter")[7] which not only included three full-day mediation sessions, but also many telephone conferences involving Justice Trotter and Class Counsel and/or counsel for the Bank that occurred between the several mediation sessions.  Trotter Dec., at ¶¶ 13, 17-18; Vendler Dec., ¶ 75.  There were also many "lawyer-to-lawyer" discussions and meetings that occurred before, during and after the mediation sessions.  *Id.*

There was also substantial substantive information exchanges between the parties, close analysis of the strengths and weaknesses of the opposing side's arguments, and lengthy settlement briefing – separate and apart from the motion briefing to the Court – that was submitted to Justice Trotter.  This briefing included the parties' analysis of all aspects of the case, including liability and damages based on the statistical information provided by the Bank.  Trotter Dec., ¶ 17; Vendler Dec., ¶ 75-79.

But throughout all of the briefing and discussions was the looming statute of limitations for tax-year 2010.  Both sides knew that if there was not a settlement by the end of 2013, the statute of limitations would run for tax year 2010 and plaintiffs would then look to the Bank for compensation for the value of their lost deductions in that year.   The early settlement Class Counsel achieved thus benefitted the Class Members much more directly than would usually be the case.  Trotter Dec., ¶ 26

The parties ultimately were able to reach agreement on the substantive relief to be afforded to the Class in the late summer of 2013.  Vendler Dec., ¶ 80.  Thereafter, the parties returned to Justice Trotter to mediate the claim for attorneys' fees and the

---

obtained to allow the discussions to continue under the *status quo* (Documents 38, 42, 47 and 49).

[7] A summary of Justice Trotter's experience and qualifications is set forth in his declaration at ¶¶ 2-12.

1  incentive awards which were to be paid by the Bank separate from the substantive

2  class recovery.  Trotter Dec., ¶ 21-22.

3       Once the full Settlement was agreed to, the parties brought their motion for

4  preliminary approval to the Court on December 13, 2013 (Document 56).  On January

5  7, 2014, this Court granted preliminary approval of the Settlement (Document 63),

6  and conditionally certified, for settlement purposes only, two classes (the "Settlement

7  Classes") under Fed.R.Civ.Proc. 23(b)(2) and (b)(3).

8  The class certified under Rule 23(b)(2) consists of:

9          "All persons who made Payments of Deferred Interest on their Option
        ARMs in Tax Years 2010, 2011, 2012 or 2013 and for whom BANA

10          was or would have been required by 26 U.S.C. § 6050H and 26 C.F.R.
        § 1.6050H-1 to file a Form 1098 for the same Tax Year in which the

11          Payments of Deferred Interest were made."

12  The class, certified under Rule 23(b)(3) consists of:

13          "all persons who made Payments of Deferred Interest on their option
        adjustable rate mortgages in Tax Year 2009 and for whom [the Bank]

14          was or would have been required by 26 U.S.C. § 6050H and 26 C.F.R.
        § 1.6050H-1 to file a 2009 Form 1098."

15

16  **III.  SETTLEMENT TERMS/VALUE**

17       Plaintiffs' complaint sought to achieve three objectives which were all

18  accomplished in the Settlement and brought significant dollar value to Class

19  Members.

20       **A.  The Value of Amended 1098 Forms For Tax-Years 2010-2012**

21       As part of any settlement, plaintiffs demanded that the Bank issue amended

22  1098 forms.  The Bank has now issued amended Forms 1098 for tax years 2010 to

23  2013 to 96,439 unique tax-payers (some have more than one mortgage and many

24  received amended Forms 1098 for multiple years).  These amended Forms 1098

25  include more than $1.2 *billion* in interest that the Bank previously failed to report on

26

27

28

Forms 1098 for those years.[8]   Armed with these amended Form 1098s, Class Members can now get *the full value* of any interest deductions they were wrongfully denied in these years.  There is no claims process for this part of the Settlement.  All Class Members have to do is to amend their 2010-2012 tax returns along with filing their 2013 returns[9] to recover their lost deductions.   The per-year amount of previously unreported interest that now appears on the recently issued amended Forms 1098 as a direct result of this Settlement is as follows:

| Tax Year | Aggregate Additional Interest Reported | Average Additional Interest Reported Per Class Member |
|---|---|---|
| 2010 | $466,798,555 | $4,925 |
| 2011 | $386,567,999 | $5,977 |
| 2012 | $245,259,380 | $6,277 |
| 2013 | $105,474,394 | $5,167 |
| TOTALS -- 2010-2013 | $1,204,100,328 | $5,500 |

Utilizing the 20% negotiated marginal tax rate, and an assumption that only 63% of homeowners itemize their deductions the total value to the class from this prong of the Settlement is $151,716,642.[10]  Lorden Dec., ¶ 12.

---

[8] McCall Dec., ¶ 12.  Another $344,69,053 in mortgage interest was wrongfully not reported by the Bank in 2009 and is dealt with in the Settlement via the claims form process. *Id.*

[9] As part of the settlement, the Bank issued amended 2013 Forms 1098 to the set of persons to whom the Bank had earlier in 2013 issued "stub" Forms 1098 after selling their loans prior to the Settlement.  This happened to plaintiff Horn. Horn Dec. ¶ 3.

[10] Attached to the Vendler Dec. as Exhibit "A" are a number of emails (solicited from Class Members who happened to contact Class Counsel after receiving the amended Forms 1098) as to the difference in deductible amounts reported to them by the amended Forms 1098.   Additionally, the Named Representatives' declarations describe the value to them of the amended Forms 1098.  For both, the value of the additional deductions they will now be able to take (and hence receive back from the IRS) is over $5,000.  See Horn Dec., ¶ 6 and Gurevich Dec., ¶ 7, respectively.

**B.    The Value Of Payments To Class Members To Offset Any Filing Costs Associated With Amending Tax Returns For Tax Years 2010-2012**

For each of the amended Forms 1098 that the Bank has sent out for tax-years 2010, 2011 and 2012, the Bank will be issuing checks for $40 to help defray the cost of amending the prior year's tax returns.  There is no claim form for this part of the Settlement.  The checks will be issued automatically to every Class Member who paid deferred interest in those years regardless of whether they choose to amend any of their returns.  Thus, the total value of this prong of the Settlement can be accurately set at $8,378,920.  Lorden Dec., ¶ 11.[11]

**C.    The Value Of Damages Payable To Qualifying Class Members For The Bank's Incorrect Reporting Of Paid Deferred Interest In 2009, And For Which Amended Tax Returns Cannot Be Filed**

As for tax-year 2009, the Bank did not report a total of $344,690,053 in Class Member interest in that year.  McCall Dec., ¶ 12.  Unfortunately, the statute of limitations for filing amended tax returns to recover any potential deductions due to the Bank not reporting payments of deferred interest for that year had already expired by the time of the Settlement.  See 26 U.S.C. § 6511.  Thus, the Settlement provides for the Bank to compensate affected Class Members.  Specifically, each qualifying class member will receive 75% of the value of their unclaimed deductions (again

---

[11] Contrary to Objector House's completely unsubstantiated claim that this amount is too little to even be "reasonable" for settlement, Exhibit "A" to the Declaration of Class Member Ivey Davis is a receipt from her accountant that it only cost her $75 to amend her tax returns for 3 years.  The $120 she is set to receive from the Bank under this prong will thus be more than enough to pay for her costs of amending her returns. In fact, she will actually profit by $65 in addition to the more than $1,000 she will get back from the IRS!  In any event, the $40 amount was a negotiated compromise that took into account litigation risks.

12-CV-1718

assuming a generous 20% marginal tax rate).[12] Given the risks inherent in litigation, the 25% settlement discount accorded to the Bank – which is really less given the generous marginal tax rate assumption – actually represents a significant victory for plaintiffs.

The potential value of this portion of the Settlement is $51,703,508 to Class Members. Lorden Dec., ¶ 9.[13]

## D.   The Value Of Prospective Injunctive Relief

In terms of injunctive relief, the Bank has agreed that from now on it will include payments of previously deferred interest in its Form 1098 calculations unless otherwise directed by subsequent law.  See Settlement Agreement ¶ 5.03.  Based on the Bank's remaining Option Arm portfolio, this prong of the Settlement is estimated to be worth $11,419,942 to Class Members.  Lorden Dec., ¶ 14.

Finally, the Bank has agreed to pay the costs of notice and administration of the Settlement.  This amount is presently estimated to be  approximately $813,491.53. A. Horn Dec., ¶ 20.  *Weeks v. Kellogg Co.,* 2013  WL 6531177 *29 (C.D.Cal. 2013)

---

[12] The negotiated 20% rate is generous and well above the national average.  This is demonstrated not only by the D'Andrea declaration filed with plaintiffs' preliminary approval motion, and attached to the Vendler Dec., as "Exhibit "B" for the Court's convenience, but more practically by the email sent to Class Counsel by Michelle Richardson, who states that the value of the deduction from the additional deferred interest reported on for tax-year 2010 is only approximately 10% of the additional interest amount reported.  See Vendler Dec., Exhibit "A", at p. 1.

[13] The claims period for this part of the Settlement remains open until July 13, 2014. It is thus impossible to tell exactly how many borrowers will actually recover under this prong of the Settlement.  While, Dr. Lorden estimates the actual payout to Class Members based on an estimated 27.4% participation rate will be $14,166,761.  Lorden Dec., ¶10.  However, Ninth Circuit case law is clear that it is the amount the defendant has agreed to pay, in this case $51,703,508, and not what it actually pays that is the appropriate measure for determining value.  See *Glass v. UBS Financial Services, Inc.*, 331 Fed.Appx. 452, 457 (9th Cir. 2009) ("25% of the total award, rather than 25% of the amount actually collected by the class, [is] proper").

(Administration costs are properly included in assessing the value of a class action settlement).

Adding up all of these prongs, the total value of the Settlement to Class Members is over $220,000,000.

## IV.   <u>NOTICE OF THE SETTLEMENT WAS PROVIDED TO THE CLASS IN THE MANNER PRESCRIBED BY THE COURT IN ITS PRELIMINARY APPROVAL ORDER (DOCUMENT 63)</u>

The Court-approved notice plan has been extremely effective and was executed to the standards of due process and Rule 23, which require that the class receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."     Fed.R.Civ.P. 23(c)(2)(B).  The notice plan provided a long form notice would be sent to all Class Members by first class mail, and a short form notice would be published in two issues of Accounting Today magazine.

The long form notice, as modified by the Court, explained to Class Members in plain, easily-understood language: (a) the nature of the action; (b) the definitions of the classes certified; (c) the full nature of the relief afforded by the Settlement; (d) the amount of attorneys' fees that was being sought by Class Counsel (e) the proposed enhancement amounts for the Class Representatives; (f) that the class member could object and/or enter an appearance through an attorney; (g) that the class member could exclude him or herself upon request; (h) the method and time to object or request exclusion and the date, time and location of the final approval hearing; and (i) that the resulting judgment would be binding on Class Members.

The Garden City Group ("GCG") was retained to serve as the claims administrator in connection with the Settlement.   A. Horn Dec., ¶ 2.   GCG implemented the terms of the notice plan approved by the Court by, among other things:  (a) distributing the Class Notice (the "Notice") in accordance with the Court's

preliminary approval order;[14] (b) maintaining a toll-free hotline and Internet website; (c) receiving and processing Claims Forms and Opt-outs, and (d) sending deficiency notices for defective claim forms, if any. *Id.* at ¶¶ 4-15. To those Class Members whose mail notices were returned as undeliverable GCG conducted a National Change of Address ("NCOA") search and attempted re-mailing. *Id.* at ¶ 6-8. Class Notices returned with a forwarding address were re-mailed to the updated address. *Id.*

The final part of the Court's approved notice plan was that the short form notice be published in Accounting Today Magazine. This was done in the February and March issues of 2014. *Id.* at ¶ 15 and Exhibit "B" thereto.

Both the long and short form notices also provided the Settlement website address www.hornsettlement.com which has been live since the notice mailing. *Id.* at ¶¶ 10-12. The content of the website is provided in both English and Spanish. *Id.* In addition to the information contained in the class notice, the Settlement website: (a) provides Class Members access to certain pleadings from the case; (b) allows them to download and submit claim forms; and (c) has a detailed FAQ section that allows Class Members to more fully understand the Settlement and how it affects them. Traffic on the website has been brisk with over 8,600 distinct visitors. *Id.* at ¶ 12. Additionally, there have been over 8,100 calls to the toll-free information hot-line. *Id.* at ¶ 13-14.

## V.   THE SETTLEMENT MEETS THE LEGAL STANDARD FOR APPROVING CLASS ACTION SETTLEMENTS

The approval of a class action settlement takes place in two stages. The court first preliminarily reviews the settlement for fairness. If it approves of the settlement, the Court will temporarily certify the class if it satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b). The court will then authorize

---

[14] A notice package was sent for each distinct loan where deferred interest was paid. Thus, persons who had multiple loans got multiple packages so they could fill in individual claim forms for each loan.

12-CV-1718

notice to be given to the class.  Fed. Judicial Ctr., Manual for Complex Litigation, § 21.633 (4th Ed. 2004); see also *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 658-59 (E.D.Cal. 2008).  In this case, the Court preliminarily approved the settlement as fair and authorized notice to be given to the Class Members on January 7, 2014. (Document 63).

The purpose of this second stage -- the "final approval" hearing – is for the court to finally determine whether the parties should be allowed to settle the class action pursuant to the terms agreed upon.  *Nat'l Rural Telecoms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

> "The 'universally applied standard' in determining whether a court should grant final approval to a class action settlement is whether the settlement is 'fundamentally fair, adequate, and reasonable.' [Citations omitted].

*Id.*  See also, *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); and *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977).

The Ninth Circuit has identified the following factors for courts to weigh in determining whether a proposed class action settlement meets this standard:

(1)    The strength of the plaintiff's case;

(2)    The risk, expense, complexity, and likely duration of further litigation;

(3)    The risk of maintaining class action status throughout the trial;

(4)    The amount offered in settlement;

(5)    The extent of discovery completed and the stage of the proceedings;

(6)    The experience and view of counsel;

(7)    The presence of a governmental participant; and

(8)    The reaction of the Class Members to the proposed settlement.

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir.1998); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 963 (9th Cir. 2009) (quoting *Molski v. Gleichi*,

318 F.3d 937, 953 (9th Cir. 2003) overruled on other grounds by *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)).

These factors cannot be applied mechanically; even a single factor sufficiently favoring settlement may outweigh all the others. *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir.1993). The over-arching test is whether "the interests of the class are better served by the settlement than by further litigation." *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832 *8 (N.D.Cal. 2010) (quoting Manual for Complex Litig. (Fourth) § 21.61 (2004)). Thus, "the decision to approve or reject a settlement [under Rule 23(e)] is committed to the sound discretion of the trial Judge." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988).

However, this discretion must be exercised bearing in mind the strong policy favoring the compromise and settlement of class actions. *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.1982); *City of Seattle*, 955 F.2d at 1276; *Garner* at *8; *Curtis–Bauer v. Morgan Stanley & Co.*, 2008 WL 4667090 *4 (N.D.Cal. 2008) ("[T]he court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class action law suits.")

The fairness of a settlement must be evaluated as a whole, rather than by assessing its individual components. *Hanlon*, 150 F.3d at 1026. Thus, the question is not whether the settlement is perfect, or even whether it could have been better, but is just whether the settlement is within the realm of reasonableness. *Id.* at 1027 and *Garner* *8; and *Fraley v. Facebook, Inc.*, --- F.Supp.2d ----, 2013 WL 4516819 *1 (N.D.Cal. 2013).

"Settlements are afforded a presumption of fairness if (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Barbosa v. Cargill Meat Solutions Corp.*, --- F.R.D. ----, 2013 WL 3340939 *11 (E.D. Cal. 2013). Put another way, approval should be granted unless the settlement, "taken as a whole, is so unfair on its face as to preclude judicial

approval." *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (citations omitted).

When the above legal standards are applied to the Settlement presently before the Court, approval is the only reasonable result. Indeed, in what was a very uncertain case at the outset, plaintiffs have achieved nearly a total victory. Not only has the bank agreed to reverse its Form 1098 policy in all future years, but it has already issued revised Forms 1098 for tax-years 2010-2013 which will allow Class Members to recover 100% of their allowable mortgage interest deductions for these years. The bank has also agreed to pay $40 for each amended return it has been forced to issue for 2010-2012 and 75% of the amount of the estimated value of the lost deductions Class Members suffered for tax-year 2009 based on a very favorable negotiated 20% marginal tax rate. Finally, the bank has also agreed to separately pay all attorneys' fees, class enhancements, litigation costs, and costs of class administration.

## A.   The Strength Of The Plaintiffs' Case

A significant marker of the uncertainty of victory inherent in plaintiffs' case is that although the Bank's practice had been in place for four full tax years, and hundreds of thousands of incorrect Forms 1098 had been issued, no one else had ever challenged it. Class Counsel's theory was completely novel; in no other case nationally had anyone ever challenged any lender over its Form 1098 reporting practices. And, as was ably pointed out in the Bank's two motions to dismiss, there were many serious legal hurdles which would have to be surmounted in order to prevail. Vendler Dec., ¶¶ 28-33 and 39-46.

First, as this was (arguably) a matter affecting taxes, the Court could well have decided to refer the issue of whether payments of deferred interest must be reported on Form 1098 to the IRS under the doctrine of primary jurisdiction. Class Counsel were especially concerned about this argument based on an experience from an earlier case. In *Zimmerman v. Cambridge Credit Counseling Corp.*, 322 F.Supp.2d 95 (D.Mass. 2004), handled by one of Class Counsel, the district dismissed a complaint on the

ground that applying the legal standard of 26 U.S.C. § 501(c)(3) belonged exclusively to the IRS. While ultimately that Court's decision was reversed in *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473 (1st Cir. 2005), the risk was very real that district courts are hesitant to wade into waters traditionally occupied by the IRS. Vendler Dec., ¶¶ 29-30. There was equally the possibility that the IRS could intervene in the case and assert a position contrary to the plaintiffs, i.e. that it had exclusive jurisdiction over the Bank's reporting policies since there are specific IRS penalties applicable to issuers of erroneous informational returns. See 26 U.S.C. § 6721. Further, it was clear from its motions to dismiss that the Bank was fully prepared to vigorously litigate this issue.

Second, there were difficulties inherent in the fact that plaintiffs were asserting purely state law claims. The bank argued that the IRS had exclusive enforcement over Form 1098 reporting such that plaintiffs could not bring any *state law* claims for damages premised on a lender's purported noncompliance with the Form 1098 reporting requirements. A key factor in determining whether the IRS has exclusive enforcement is whether Congress created a private right of action under *federal law* in regard to Form 1098 reporting.

The Bank argued that because 26 U.S.C. § 7434 provides a private right of action for taxpayers to sue for the wrongful issuance of certain types of informational returns, *but not Forms 1098*, Congress had implicitly determined that no such suit should lie. And, while *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555 (6th Cir. 2007) (en banc), *cert. denied*, *Centerior Energy Corp. v. Mikulski*, 553 U.S. 1031, 128 S.Ct. 2426, 171 L.Ed.2d 229 (2008) favored plaintiff's position on this point -- that they could sue under state law theories -- it is the only case nationally to address whether 26 U.S.C. § 7434 is preemptive over state law claims. There is no Ninth Circuit authority on point, or even remotely analogous. Vendler Dec., fn. 1.

Third, the Bank was also asserting that a class would be unmanageable because, according to the Bank, certain tax-payers, such as those with rental properties, or with

mortgages of over $1,100,000 were not damaged by the wrongful Form 1098 reporting.

Fourth, the Bank also (correctly) argued that the IRS has never taken a formal position in any published regulation (or even in a private letter ruling) that the Bank's method for calculating interest was wrong. There are regulations such as those dealing with the reporting of deferred interest in graduated payment mortgages and in student loans that plaintiffs believe are analogous, but the issue was indisputably not iron-clad.

These are just some of the many hazards that could have derailed plaintiffs' action entirely or left it in litigation limbo for years. Indeed, as there were several matters of first impression, the case could well have ended up in the Ninth Circuit no matter which side won at trial. There were other significant pitfalls, including the risk that plaintiffs' contract-based claims would fail because the Bank's mortgage contract makes no mention of any 1098 reporting obligation, or that the IRS could decide (perhaps at the Bank's instance) to issue a regulation governing the reporting of deferred interest in the mortgage context that differed from plaintiffs' view.

If the contract claims failed, plaintiffs would have been left with only their UCL claim, which arguably could not be made the foundation for a national class. *Norwest Mortgage, Inc. v. Superior Court*, (1999) 72 Cal.App.4th 214, 222 (California statutes generally do not have extraterritorial reach).

Thus, while litigation is never free of uncertainty,[15] this case was extremely uncertain. Given the potential legal pitfalls and the unlimited resources available to the Bank to litigate, the near complete victory the Settlement brings to the class overwhelmingly supports granting the motion.

---

[15] *In re Aremis Soft Corp. Sec. Litig.*, 210 F.R.D. 109, 125 (D.N.J. 2002) ("Regardless of the strength of case counsel might present at trial, victory in litigation is never guaranteed."

**B.** **Settlement Is Appropriate In Light Of The Risks Involved And The Results Achieved**

This factor overwhelmingly supports the Settlement. The risks involved were high and the Settlement is nothing short of a home run for Class Members. At the time the Settlement was agreed to, both sides were at great risk from the upcoming motions. The plaintiffs faced the potential that their action could be dismissed (or sent to the IRS). The Bank faced the potential for an injunction that would potentially cause great unrest within its organization. Either way, as there were essentially no factual disputes at issue, the hearing on the cross motions had the potential to be dispositive of the entire case.

Moreover, because of the absolutely immoveable 3-year statute of limitations for amending tax returns imposed by 26 U.S.C. § 6511, it was a virtual certainty that the longer this case was litigated, the worse the end result would be for the class. A trial (and inevitable post-trial appeals) would have taken years to conclude and would have ensured that Class Members could never have recovered the full value of their lost deductions from the IRS, *as they can do now*. Without a Settlement, their sole avenue of recovery would have been from the Bank, which was hardly a sure-fire bet given the litigation risks involved. Indeed, a delay in settling this case by even a few additional months would have collectively cost Class Members millions of dollars in terms of their the ability to recapture the value of their lost deductions for tax year 2010 from the IRS and would certainly have resulted in the Bank insisting on a "settlement discount," as it did for tax-year 2009. Indeed, it is likely that the settlement discount demanded would have been greater as the aggregate cost of such a settlement to the Bank would have more than doubled. Over $100 million more in deferred interest was not reported by the Bank in 2010 than was omitted in 2009.

In short, weighing heavily on the scale for Class Counsel in addition to the uncertainty of prevailing in their legal arguments was the certainty that as the years passed, the Bank would become less and less willing to settle because it would have to

fund more and more of the cost required to make Class Members whole.   Vendler Dec., ¶ 56.  Class Counsel simply could not overlook this fact in negotiating with the Bank, and the Bank, likewise, could not overlook in negotiating with plaintiffs how its exposure would increase with the passage of time.

Class Counsel also had to consider that the Class Membership is comprised primarily of financially distressed homeowners..  After all, this was the reason many people chose an Option Arm loan in the first instance.  The simple fact is that the window of obtaining monetary relief from the IRS through amending prior tax returns was, and is, a vanishing one by statute.  It simply would not have been available if the case had proceeded to a later settlement or trial.

Even assuming that after years of additional litigation, Class Counsel could have later obtained the same 75% settlement for tax-years 2010-2012 that they achieved for 2009 -- for which there absolutely is no guarantee since the real cost to the Bank from such a settlement would have essentially doubled with every passing year – the result to the class would be a substantial net loss over what is now being proposed.   The proposed Settlement, by contrast, provides Class Members an expeditious method to get back *the entirety of the value of their lost deductions for 2010, 2011 and 2012* and 75% of the value of their lost deductions for 2009.

Finally, adding to the risk of taking on the case was that the Bank was represented by one of the largest and most prestigious law firms worldwide with a long reputation for delivering skill and experience in complex litigation.   *In re Heritage Bond Litigation*, 2005 WL 1594403 *20 (C.D.Cal. 2005) ("the quality of opposing counsel is important in evaluating the quality of Plaintiff's counsel's work"); *Vizcaino*, 142, F.Supp.2d at 1303.  *In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1337 (D.C.Cal. 1977) ("plaintiffs' attorneys in this class action have been up against established and skillful defense lawyers, and should be compensated accordingly.")  In fact, one of the Bank's several lawyers present during

each session of the mediation process was a former IRS Commissioner.  Trotter Dec., ¶ 15.

More than any other factor, therefore, this factor supports the approval of the Settlement.

### C.    Maintaining Class Certification

While the Bank argued that there were manageability problems stemming from, for instance, some borrowers owning rental properties and others having mortgages over the $1,100,000 deductible limit, plaintiffs' view has always been that class certification is appropriate in this case since the Bank committed the same wrong as to every Class Member.  Plaintiffs thus believe that they would have been able to maintain class status throughout trial.  Indeed, this Court found as part of the preliminary approval motion that all of the requirements for class certification were met and plaintiffs believe that ruling was correct.  And, in fact, the extremely positive class response rate indicated that the classes certified were manageable.  This factor therefore supports approval of the Settlement.

### D.    The Amount Of The Settlement And The Benefits To The Class Are The Product Of Hard Fought, Non-Collusive Negotiations And Warrant Approval

This Settlement was only achieved after very hard fought negotiations and extensive settlement-oriented information sharing between the parties spread over the course of almost a year.  The parties agreed, while the cross-motions were pending, to open settlement discussions.  Counsel met for an initial discussion about information needed in order for class counsel to evaluate the case for settlement purposes.  It was agreed the Bank would provide certain information to plaintiffs' counsel.  It was further agreed mediation would be conducted before Justice Trotter.  Justice Trotter has been involved in mediating settlements in class actions and mega cases for approximately 25 years and has been acquainted with both plaintiff and defense counsel in this matter.  Trotter Dec., ¶¶ 2-12, 15 and 24.

12-CV-1718

The Bank provided information to plaintiffs' counsel including, *inter alia*: (a) when it started its policy of not reporting deferred interest on Forms 1098; (b) the year-by-year totals for how many mortgages were affected by the policy; and (c) the aggregate amounts of deferred interest per year that had not been properly reported. This allowed plaintiffs "sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir.1998). Vendler Dec., ¶ 75. Justice Trotter was also provided the same information relating to class size and amounts of deferred interest so that he could evaluate the case. Trotter Dec., ¶ 17. Each side also prepared extensive briefing on the legal and factual arguments supporting their respective positions.

At the first mediation session, Justice Trotter noted that the plaintiffs contended this was a fee shifting case and the Bank would be requested to pay attorneys' fees and costs outside of any class settlement fund. Justice Trotter made it clear that if this was an issue, there would be no discussion whatsoever regarding attorney's fees or costs payable solely by the Bank until a settlement was reached as to all relief to be afforded Class Members. (Trotter Dec., ¶ 16; Brown Dec., ¶ 53; Gurevich Dec., ¶¶ 16-19; Vendler Dec., ¶74; Poindexter Dec., ¶¶ 16-17; Horn Dec., ¶¶ 17-19.)

Present at mediation for the Bank was an attorney who had been the former Commissioner of the Internal Revenue Service. Trotter Dec., ¶ 15.

Vigorous discussions and negotiations were held. Subsequent to this first session, additional time was needed for both sides to again research and brief legal and factual issues. Extensive preparation went into a second mediation session. Communications were held with the mediator as he conducted shuttle diplomacy between the parties.

Justice Trotter was provided with information relating to class size, membership, values of deferred interest and other damages claims. He conducted communications with counsel over several months. *Id.* at ¶ 17. Justice Trotter worked consistently between mediation sessions with numerous phone calls to

counsel trying to bridge the many divides that existed.  Vendler Dec., ¶ 75.  There was a third mediation session at which time, with the assistance and recommendations of the mediator, the claims on behalf of the class were settled.  *Id*. at ¶ 80.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011). ("Participation of a mediator is not dispositive, but is 'a factor weighing in favor of a finding of non-collusiveness.'").

At all times the positions on each side were vigorously contested.  Trotter Dec., ¶¶ 17, 20, 22; Vendler Dec., ¶¶ 73-79; Brown Dec., ¶¶ 54-62; Poindexter Dec., ¶ 15.

All during this time, the Court agreed to continue the pending motions to accommodate the settlement discussions while maintaining the status quo.  There was simply no collusion in reaching this Settlement and this factor supports the granting of the motion.

**E.     The Experience And Views Of Counsel Favor Final Approval**

"When approving class action settlements, the court must give considerable weight to class counsel's opinions due to counsel's familiarity with the litigation and its previous experience with class action lawsuits."  *Murillo v. Pacific Gas & Elec. Co.*, 2010 WL 2889728 *10 (E.D.Cal. 2010); *Officers for Justice v. Civil Serv. Comm'n of the City & County of S.F.*, 688 F.2d 615, 625 (9th Cir.1982).  Here, plaintiffs' counsel are very experienced with taking on big corporations, including banks, in complex class actions.  Vendler Dec. ¶ 2-22; Brown Dec., ¶¶ 2-10; Poindexter Dec., ¶¶ 2-3.  Based on that extensive experience, Class Counsel believe that the Settlement they achieved is not only "adequate," but genuinely a tremendous victory for the class.

When plaintiff Horn first filed this action, his complaint sought to force the Bank to: (1) issue corrected 1098 returns for 2009-2012; (2) pay damages attributable to the improper reporting, including lost deductions and accountancy fees that would be required to amend the prior returns; and (3) change its policy so that it would

1  prospectively report all payments of deferred interest; (4) pay all attorneys' fees and

2  costs for the litigation.  The bank has agreed to virtually all of this relief.

3       For tax-years 2010-2012, *more than 96,000 amended Form 1098s have already*

4  *been sent to the class*.  The Bank has also agreed to pay each Class Member $40

5  toward the cost for amending their tax returns.  No claim forms were required for this

6  part of the Settlement.

7       For tax-year 2009, where the statute of limitations for amending tax returns

8  expired, the Bank is compensating each Class Member by paying qualifying Class

9  Members 75% of the estimated amount of the value of their lost deductions.  While

10 there is a claim form required for this portion of the Settlement, it is a simple 5

11 question fill in the box form.  After that, the Class Members do not have to do

12 anything further.  All of the benefits will be calculated by the Bank based on the Class

13 Member's payment history.  Already more than **54,000** claim forms (from more than

14 17 percent of Class Members) have been received by the claims administrator even

15 though the claims period does not expire until July 13, 2014.  In total, it is estimated

16 that approximately 80,000 Class Members will file claim forms.  Lorden Dec., ¶ 8.

17      This is not a coupon-type settlement.  Rather, given the aggregate amount of

18 interest not reported on Forms 1098 between 2009 and 2012, the total value of the

19 Settlement is worth hundreds of millions of dollars -- even without counting the value

20 of the prospective relief.  *Id.* at ¶¶ 9-14.  This Settlement puts real money – in many

21 cases thousands of dollars – directly into Class Members' pockets.  See Gurevich

22 Dec., ¶ 7; Horn Dec., ¶ 9; Davis Dec., ¶ 3; Vendler Dec., Exhibit "A."

23      Finally, the Bank has agreed to pay all attorneys' fees, litigation costs, and all

24 costs of class administration.

25      For all of these reasons, this result of this litigation can only be described as a

26 "home run" for the Class Members.  The Settlement accomplishes virtually everything

27 sought in the complaint and eliminates the risk that the class might get nothing after

28

years of additional litigation, or might recover an amount substantially less than the funds obtained by the Settlement.

### F.   The Presence Of A Governmental Participant

Pursuant to the Class Action Fairness Act ("CAFA"), the Bank was obligated to notify the United States Attorney General and certain other federal and state officials as a condition of obtaining Court approval.  See 28 U.S.C. § 1715.  A list of the officials notified appears on Exhibit "A" to the Declaration of Peter Morrison ("Morrison Dec.").  Despite this notice, no state or federal officials have raised any objection to the Settlement.  "Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures."  *Garner*, 2010 WL 1687832 *14.  This factor favors approval of the Settlement.

### G.   The Reaction To The Settlement Has Been Extremely Positive

The positive response of the Class Members to the Settlement is best demonstrated by the fact that out of more than 310,000 notice packets mailed out, only 28 timely requests for exclusion have been received (A. Horn Dec. at ¶ 16) and that only one objection has been filed (by a felon lawyer with current state bar charges pending who has been roundly condemned as a "vexatious" "serial objector" by a number of federal courts, including one in this district.  See *Dennis v. Kellogg Co.*, 2013 WL 6055326 (S.D.Cal. 2013) ("Mr. Palmer has been deemed a 'serial objector' " with a history of "admitt[ed] ... 'bad faith and vexatious conduct'"), (quoting *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 159 at fn. 40 (E.D.La. 2013).  Other than this single objection filed by Mr. Palmer, there have been no others.

"The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the settlement are favorable to the Class Members."  *Eisen v. Porsche Cars North America, Inc.*, 2014 WL 439006

*5 (C.D.Cal. 2014), (quoting *Nat'l Rural Telecomms.*, 221 F.R.D.523, 529 (C.D.Cal. 2004). See also *In re Mego Fin. Corp.*, 213 F.3d at 459 (single objection out of a potential class of 5400) and even *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir.2004) (500 opt-outs and *45 objections* out of approximately 90,000 notified Class Members still deemed a positive reaction). Here, with notice going to over 309,000 addresses, that there has been just one lone serial objector – represented by a vexatious professional objector lawyer – strongly favors the presumption that the Settlement is favorable to the class.

As to opt-outs, the statistics are similarly compelling. Less than 1/10 of one percent of Class Members have opted out. In *Chun-Hoon v. McKee Foods Corp.*, 716 F.Supp.2d 848, 858 (N.D.Cal. 2010) even though opt-outs comprised fully 4.86% of the class, the Court still found a positive response by the class warranting the presumption of favorability.

But the most compelling statistic is the extremely positive response of the Monetary Settlement Class Members to the claims process for the 2009 tax-year. In order to receive a payment, these Class Members were required to complete a very simple claim form and send that form to the class administrator.

As of the filing of this motion, more than **54,000** claim forms have been received (from 17.8% of Class Members). A. Horn Dec., ¶ 18. This response rate is already more than double typical consumer class action response rates. See *Sullivan v. DB Investments, Inc.* 667 F.3d 273 (3d Cir. 2011) ("consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns"). Moreover, there are still more than three months to go in the claim period before its expiration on July 13, 2014. Based on an extrapolation of the weekly response data so far, it is estimated that by the end of the class period, 25.3% of Class Members will have responded. Lorden Dec., ¶8. This is a positively unheard of response rate in a

1  consumer class action case.[16]

2      This factor, too, overwhelmingly supports approving the Settlement.

3  **IV.**   **CLASS COUNSEL'S REQUESTED LEGAL FEE OF $10.5 MILLION IS**

4         **REASONABLE AND SHOULD BE APPROVED**

5      Plaintiffs' contended that this was a case in which the attorney's fees and costs

6  were to be paid by the defendant Bank as they were recoverable under certain theories

7  plead in the First Amended Complaint.  Without determining if plaintiffs were correct,

8  Justice Trotter prohibited any discussion of attorney's fees or costs, either liability or

9  amount, while the Class Settlement was being negotiated.  Trotter Dec. ¶ 16.

10      Once the class Settlement was finalized, the Bank agreed it would pay the

11  attorney's fees and costs.  The parties returned to Justice Trotter to mediate the issue

12  of a reasonable fee for Class Counsel.  With the assistance of Justice Trotter, and after

13  aggressive negotiating regarding time spent on the case, value of the Settlement to the

14  class and the application of the standards to be applied within the Ninth Circuit for a

15  percentage based fee, the Bank agreed that it would pay Class Counsel, separate and

16  apart from any payment for the benefit of Class Members, $10.5 million as a

17  reasonable fee for representation of the Class.  Trotter Dec., ¶¶ 23-32.  The Bank also

18  agreed it would pay Class Counsel's costs up to a stated amount, as well as all class

19  settlement administration fees.

20      Class counsel now comes to this Court for approval of this negotiated fee which

21  no part comes from the Class Settlement.

22      There are two methods by which courts review attorneys' fees in class action

23  cases. Under the "percentage of the benefit" method, the reasonable attorney's fee is

24  set as a percentage of the value delivered to the class. *Boeing Co. v. Van Gemert*, 444

---

25  [16] It is fair to assume then that at least these individuals all read the class notice.  But,

26  remarkably, none objected to the Settlement.  Rather, they understood the benefit they

27  would receive and chose to participate in the Settlement.  Indeed, the only person
objecting to the Settlement is a "serial objector" whose only interest is to hold up the

28  class's recovery for his own benefit.

U.S. 472, 478 (1980). The alternative to the "percentage of the benefit" method is the "lodestar" method which involves "multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonably hourly rate and then, "if circumstances warrant, adjust[ing] the lodestar to account for other factors which are not subsumed within it." *Staton v. Boeing Co.*, 327 F.3d 938, 969 (9th Cir. 2003), quoting *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n. 4 (9th Cir.2001). Always, "[t]he ultimate goal is to award a reasonable fee." *Hartless v. Clorox*, 273 F.R.D. 630, 645 (S.D.Cal.2011).

Under the careful guidance of Justice Trotter, the parties in this case did not even discuss the issue of legal fees until *after* the class relief had been entirely agreed upon. Trotter Dec., ¶¶ 16 and 21; Vendler Dec., ¶ 74; Poindexter Dec., ¶¶ 16-17; Brown Dec., ¶ 62-64; Gurevich Dec., ¶¶ 16-19 and 28, and R. Horn Dec., ¶¶ 17-19. In short, the amount of the legal fee did not have any impact on the amount the class is receiving under the Settlement and the recovery for the Class Members is absolutely *not* conditioned upon obtaining judicial approval of the agreed-upon fees. See Settlement Agreement Section 5.04.

This process for setting legal fees – with the aid of a well-respected mediator and only after the class relief has been fully agreed to – has been specifically approved by the Ninth Circuit in *Hanlon* (district court properly "relied on the mediator as independent confirmation that the fee was not the result of collusion or a sacrifice of the interests of the class.") *Hanlon*, 150 F.3d at 1029. This protective process eliminates the "adversarial relationship" described in *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir.2010) in which the attorneys' fee is to come directly out of a "common fund," i.e. where every dollar the attorneys get is one less that is gotten by the class. See also *Eisen v. Porsche Cars North America, Inc.*, 2014 WL 439006 *10 (C.D.Cal. 2014) ("*Mercury Interactive* is [] distinguishable from the Settlement here, which does not involve a common fund apportioned between relief and fees.")

*Hanlon* also makes clear that where this protective process is utilized, i.e. involving a well-respected mediator and determining the class relief separately from the attorney fee, the district court can properly award fees using either lodestar or percentage of the recovery principles, even if the settlement is not strictly a "common fund" settlement, but is one where the fee is negotiated separately.  150 F.3d at 1029 (percentage of the benefit method for analysis of legal fees can be appropriate where fees are negotiated with mediator only after concluding negotiations regarding class relief).  See also *Johansson-Dohrmann v. Cbr Systems, Inc.*, 2013 WL 3864341 *8 (S.D.Cal. 2013) (using percentage of the benefit method for calculating fees in case where class relief and attorney's fees were separately negotiated with assistance of a well-respected mediator).

Here, whether based on percentage of the recovery principals or on a loadstar analysis, the agreed-upon fee is justified and its approval will not negatively affect the class in any way.

**A.**  **Class Counsel's Proposed Fee of $10.5 Million Is Supportable Under The Percentage Of Recovery Approach**

The Ninth Circuit has stated that a "reasonable" attorney fee under percentage of the recovery principles is dependent upon "all the circumstances of the case," with the benchmark being 25%, and 33% being the (apparent) maximum.  See *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) and *In re Pac. Enters. Secs. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995).  Ninth Circuit case law also makes clear that the value of a settlement under this method should not be narrowly measured by "how much money a company spends on purported benefits, but the value of those benefits to the class."  *Bluetooth Headset Prods. Liab. Litig.* at 942.  Here, although the Bank will be paying tens of millions of dollars to Class Members -- from the 2009 claim form part of the Settlement and from the $40 payments to the recipients of the amended Forms 1098s -- the class will also be receiving tens of millions of dollars in direct

1    monetary benefits from the IRS in the form of the additional tax refunds made

2    possible by forcing the Bank to issue amended Forms 1098 for tax-years 2010-2013.

3    In total, the value to the class from this Settlement is comprised of five

4    elements.  The first element is the money the bank has agreed to pay Class Members

5    for the deductions they lost in tax-year 2009.  The aggregate amount the Bank has

6    agreed to pay for this element is $51,703,508, based on $344,690,053 in total

7    previously unreported interest.  Lorden Dec., ¶9.  And, while it is true that not all

8    Class Members will file claim forms, *Boeing Co.* holds that "the attorneys for a

9    successful class may recover a fee based on the entire common fund created for the

10   class, even if some Class Members make no claims against the fund so that money

11   remains in it that otherwise would be returned to the defendants." *Boeing*, 444 U.S. at

12   480–81.  See also *Glass v. UBS Financial Services, Inc.*, supra, at 331 Fed.Appx. 457

13   ("25% of the total award, rather than 25% of the amount actually collected by the

14   class, [is] proper"); *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026,

15   1027 (9th Cir. 1997) (same); and *Young v. Polo Retail*, LLC 2007 WL 951821 *8

16   (N.D.Cal. 2007).[17]  There is no cap on the amount the Bank will pay under this prong

17   that might result in a pro-rate distribution.  Rather, the Bank will pay 100% of the

18   amount due to every qualifying claimant.

19   The second value-element in the Settlement is the $40 checks that will be sent

20   corresponding to the number of amended Forms 1098 issued by the Bank.  The total

21   value of this part of the Settlement is $8,378,920.  Lorden Dec., ¶ 11.[18]

---

22   [17] As mentioned, the claims period is still open and will remain so for several more

23   months.  Thus, there is no way yet to determine precisely how much will actually be

24   paid out by the Bank under this prong.  However, as mentioned, the response rate,

25   which is already at roughly 17% well exceeds the average "take rate" for consumer

26   class actions and demonstrates an extremely positive view of the settlement by the

     class.

27   [18] Although granted as part of the injunctive relief of forcing the bank to issue revised

28   Forms 1098, the value of the $40 checks is readily calculable from the 209,473

     amended Forms 1098 that have been issued by the Bank.  This value can therefore

The third element of value in the Settlement is the checks/credits that Class Members will get from the IRS by amending their tax returns with the revised Forms 1098 they were sent by the Bank.  The value of this benefit can be fairly estimated to be $151,716,642.  *Id.* at ¶ 12.  Specifically, the tax code clearly imposes an affirmative duty upon taxpayers to file accurate tax returns.  *United States v. Hicks*, 947 F.2d 1356, 1360 (9th Cir.1991) and *McCurry v. C.I.R.*, 133 F.3d 928 (Table) (9th Cir. 1997).   Therefore, this Court can, and should, presume that Class Members who originally itemized and claimed their interest deduction in 2010-2013 will amend their returns for those years to obtain the additional deductions from this newly reported mortgage interest.

The total amount of interest that was not reported in these years by the Bank was $1,204,100,328.  McCall Dec., ¶ 12.  The parties have stipulated in the Settlement Agreement that the average marginal tax rate during the years in question is 20%.  Thus, the aggregate value of the deductions lost is $240,820,066.  In fairness, this amount must be reduced by the 37 percent of American homeowners who do not itemize their deductions.  Therefore, the total value of this prong of the Settlement is $151,716,642.[19]  Lorden Dec., ¶ 12.

---

properly be counted in a percentage of the benefit type of fee analysis.  *Staton* at 327 F.3d 974.

[19] Again, this settlement is unique in that as a result of the settlement, Class Members will be receiving a direct *cash* benefit from a third party.  But if the Court finds that this cash benefit should not be counted in the percentage of the benefit calculus because it derives from the injunctive relief portion of the settlement and that its amount is not sufficiently certain, then the Court should implement a substantial upward adjustment of the 25% benchmark since total value of the injunctive relief provided by the settlement, i.e. both the value created by the revised Forms 1098 and the value created by forcing the Bank to change its practices prospectively is worth more than $150,000,000 of dollars to Class Members.  Lorden Dec., ¶ 12-14.

The fourth element of value is the Bank's agreement to pay the costs of notice and class administration. This amount is estimated to be $813,491.53. A. Horn Dec., ¶ 20.

The final element of value to the class is the injunctive relief. The bank has now changed its accounting practices so that in the future it will include payments of deferred interest in its Form 1098 calculus (unless Congress, the Department of Treasury, or the IRS issues contrary regulations). This change in reporting means Class Members will no longer be overpaying their taxes as they had unknowingly been doing. The estimated value of this prong of the Settlement based on the Bank's current portfolio is $11,419,942. Lorden Dec., ¶ 14. Plaintiffs concede that under *Staton*, this value cannot be included in determining a fee based on percentage of the value principles, but instead should be weighed as a factor to increase the percentage of the fee to be awarded above the benchmark of 25%. *Id.* at 327 F.3d 973-974.

Thus, the pool from which a percentage fee should be calculated is comprised of the following elements of value delivered to Class Members by the Settlement:

| CATEGORY OF RELIEF | VALUE |
|---|---|
| 2009 Claim Form | $51,703,508 |
| $40 Checks -- For Each Amended 1098 | $8,378,920 |
| IRS Payments Based On Amended Returns | $151,716,642 |
| Class Administration Costs | $813,491.53 |
| **TOTAL VALUE** | $212,612,561.53 |

As stated, 25% is the benchmark for attorneys' fees under the percentage of recovery approach. Applying a 25% percentage results in a fee of over $53,000,000. However, Class Counsel and the Bank – with the assistance of Justice Trotter – negotiated what is a reasonable fee given all of the circumstances in this case and

agreed, subject to Court approval, to $10.5 million dollars.   Trotter Dec., ¶   31.
Indeed, the $10.5 million requested is substantially below the 25% benchmark even if
the Court were to entirely exclude the value of the amended returns for 2010-2012 --
(25% of $60,895,919.53 = $15,223,980).

Moreover, the factors courts generally consider in determining whether to
depart from the benchmark would, in this case, warrant an upward adjustment from
25% to 33%. *Vizcaino*, 290 F.3d at 1048-1050.

### 1.    *Results Achieved*

The quality of the result achieved is a relevant factor in coming to a fee award."
*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir.1993); *Six (6) Mexican
Workers v. Ariz. Citrus Growers*, 904 F.2d at 1311 (9th Cir.1990) (noting plaintiffs'
"substantial success" in the litigation).   As already detailed above, plaintiffs' counsel
achieved a near total victory in this case.  In addition to recovering at least 75% of the
total value of the lost deductions for tax-year 2009, the action forced the bank to issue
revised Form 1098s to all Class Members for tax-years 2010-2012 so that they could
recover 100% of the value of their lost deductions for those years.  Further, the Bank
agreed to pay $40 toward the cost of amending Class Member returns.  There is even
more value to the class in the injunctive relief which led to over $100 millions of
dollars in benefits across the class.  Finally, the Bank agreed to pay attorneys' fees,
litigation costs and costs of class administration.

### 2.    *Risk of Litigation*

It is an established practice to reward attorneys who assume representation on a
contingent basis with an enhanced fee to compensate them for the risk that they might
be paid nothing at all. *Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385 (N.D.Cal. 2011)
and *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 and
1301 (9th Cir.1994).  Here, the risk of protracted litigation was great.

First, as explained earlier, this case involved novel and complicated issues of
tax law and federal jurisdiction that were of first impression nationally.  Second, the

Bank is a massive organization with virtually inexhaustible resources to fund litigation. Third, the Bank was represented by two sets of very well respected counsel, (including a former Commissioner of the IRS), who vigorously contended from the outset that plaintiffs' claims were entirely meritless. Fourth, plaintiffs were demanding a complete reversal of a Bank policy that had been in place for five years. This was a significant hurdle because it would not only require the Bank to change its internal policies, but would also require it to notify the IRS, which had the potential to levy separate and distinctly negative consequences on the Bank separate and apart from this litigation.

"Risk is a relevant circumstance" to establishing fees. *Vizcaino*, 290 F.3d at 1048. While plaintiffs were eventually able to negotiate a settlement with the Bank, it could just as well have ended up that Class Counsel would have been embroiled for years in this litigation with the risk that in the end, they would obtain no return whatsoever. At the inception of their relationship with Mr. Horn, and later with Ms. Gurevich, Class Counsel promised to commit the legal and financial resources necessary to this litigation. Class Counsel took that risk without knowing what the outcome would be and now deserve to be fairly compensated for doing so.

The commencement of a class action is no guarantee of success. Class Counsel have received no compensation for the time they have invested in the case during the years that this litigation has been pending and they have incurred tens of thousands of dollars in costs in litigating for the benefit of the Class. See generally, Vendler, Brown and Poindexter Decs. Despite these many risks, Class Counsel committed their financial and human resources to litigating this case and achieved a great result for the Class.

### 3. *Class Counsel Generated Huge Benefits Beyond the Cash Settlement Fund*

As a direct result of this lawsuit, the Bank will forever include deferred interest payments in its Form 1098 calculus. This will benefit not only current Class

Members, but future borrowers as well.  And, while plaintiff has argued that the money the class will receive from the IRS as a result of the amended Forms 1098 issued for 2010-2012 should be counted in the gross percentage calculation, even if the Court does not agree, the huge value attached to this portion of the Settlement would warrant an upward adjustment from the 25% benchmark to at least 33%.

### 4. *Class Counsel's Relatively Early Settlement Was Greatly Beneficial to the Class*

While it is true that some published cases talk about the length of time that counsel worked on the matter to justify a fee, in this case, counsel's ability to deliver a settlement early was a huge benefit to the class.  Indeed, the longer this case dragged on, the worse the result would have been for the class because of the three year statute of limitations for amending tax returns.  Counsel recognized this fact and pressured the Bank by arguing that for every year that slipped, the Bank's exposure would substantially increase.  In short, while early settlements generally benefit all parties and the Court, the particular facts of this case made this especially true.  *In re M.D.C. Holdings Securities Litigation*, 1990 WL 454747 * 7 (S.D.Cal. 1990) "Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements—especially in complex class action cases—should be done."  Class Counsel followed this mandate (which was particularly appropriate in this case) and should not be penalized for having done so.  Thus, this factor too warrants an upward adjustment.

Justice Trotter's participation in the negotiation of the class Settlement and then the separate negotiation of a fair and reasonable fee should not be overlooked.  Unlike cases where a mediator, disconnected from an underlying matter, is asked to evaluate the attorney's work and results obtained in order to determine a reasonable fee, Justice Trotter participated intimately in the settlement of the class claims.  Trotter Dec., ¶¶ 21-24.  He thus had a unique, and first hand understanding of the challenges presented by the class claims, the vigorous defense being mounted, the negotiating

skills in bringing about the early Settlement and the importance of an early, but significant, settlement for the class. *Id.* at ¶¶ 17-32. Justice Trotter was in the extraordinary position of being able to encourage and complete an early settlement, but also being of the belief Class Counsel should not be penalized for achieving an outstanding, highly beneficial result for the class. In Justice Trotter's opinion, the negotiated fee is reasonable given the totality of the circumstances in this case. Trotter Dec., ¶ 26.

### 5.    *A Lodestar Cross-Check Validates the Requested Fee*

Where courts apply the percentage method to calculate fees, they generally also use a rough calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award. *Vizcaino*, 290 F.3d at 1050. A "lodestar" is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). In this case, Class Counsel, who are very experienced litigators, including substantial experience with class actions against financial institutions (Vendler, Poindexter and Brown Decs. at ¶¶ 2-22, 2-3, and 3-8, respectively) have spent more than 3,000 hours working on this case from pre-filing investigation to the present.[20] *Id.* at ¶¶ 89, 20, and 80, respectively.[21]

Further, this lodestar figure does not include the substantial amount of time that will be required of Class Counsel up through and after final judgment to fulfill their

---

[20] Detailed time sheets are not necessary to establish lodestar amount. *Fox v. Vice*, — – U.S. ——, ——, 131 S.Ct. 2205, 2216, 180 L.Ed.2d 45 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.)

[21] Declarations regarding the prevailing market rate in the relevant community suffice to establish a reasonable hourly rate. *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir.1998) and *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir.1996) (noting that declarations from attorneys in the community can provide adequate proof of the reasonableness of counsel's rates).

continuing obligations to the class to monitor the claims process and answer questions from Class Members – which come in every day and will likely continue to come in for years. *Hanlon*, 150 F.3d at 1029 (affirming fee award because, among other things, class counsel "must remain available to enforce the contractual elements of the settlement agreement and represent any Class Members who encounter difficulties").

Assuming a reasonable hourly rate of $800.00 per hour, which is both reasonable for complicated class action work in the Southern California legal market[22] and is very likely substantially less than the rates being charged by the Bank's attorneys,[23] Class Counsel's lodestar, excluding costs is $3,315,000.  See Vendler, Poindexter and Brown Decs. at ¶¶ 89, 21 and 80, respectively.

When, as here, the attorneys have obtained an extraordinary result and have taken the case on a contingency, district courts routinely apply a multiplier to the lodestar calculation to compensate for the risk of nonpayment. *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300–1301 (9th Cir. 1994) (noting that "courts have routinely enhanced the lodestar to reflect the risk of non-payment" and finding district court's failure to apply multiplier to lodestar calculation was abuse of discretion where case was "fraught with risk and recovery was far from certain").  The range of multipliers is typically from 1 to 4 times the lodestar, but can be higher. *Vizcaino*, 290 F.3d 1051 at fn. 6 (ultimately approving multiplier of 3.67); *Van Vranken v. Atl. Richfield Co.*, 901 F.Supp. 299 (N.D. Cal. 1995) (approving a

---

[22] The relevant community for establishing lodestar rates is that in which the district court sits. *Schwarz v. Sec'y of Health and Human Serv.*, 73 F.3d 895, 906 (9th Cir.1995).

[23] See Vendler, Brown and Poindexter Decs. and *Hartless v. Clorox Co.*, 273 F.R.D. 630, 644 (S.D.Cal. 2011) (approving $675 to $750 partner rates for work done in 2010).  See also, 2013 National Law Journal Survey of Billing Rates (attached to the Vendler Dec. as Exhibit "C") which not only states that the average partner rate among large law firms in the Los Angeles legal market is $665, but notes that several such firms, including the Bank's counsel in this case, are now routinely charging over $1,000 per hour for many of their partners.

multiplier of 3.6); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 255 (2001) ("Multipliers can range from 2 to 4, or even higher.")[24]   The factors bearing on how high the lodestar multiplier should be depend on the risks undertaken and more than anything else, the results achieved. *Vizcaino,* 290 F.3d at 1051.

Here, as previously explained in detail, the risks of this litigation were great and results extraordinary.  This case raised multiple issues of first impression nationally and plaintiffs were taking on a behemoth of an organization with unlimited funds and first quality legal counsel.  As a result of the case, Class Members will all be able not only receive payment for the vast majority of the deductions they lost for 2009, but can recover all of their lost deductions for 2010-2013 along with $40 checks for each of the amended Forms 1098 issued by the Bank.  Further, the Bank will never deny Class Members these deductions again.   The overall value to the class is in the hundreds of millions of dollars and without Class Counsel being willing to take the substantial risk this case involved, there would have been no recovery.  Thus, at least a 4 times multiplier is appropriate.[25]

---

[24] Nationally, the law is consistent with many cases finding multipliers of 4 or upwards. *In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) (recognizing that a "lodestar multiple in the range of 4.5 to 8.5" is "unquestionably reasonable" under the cross-check approach); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee that resulted in a multiplier of 9.3 times hourly rate), affd, 66 F.3d 314 (3d Cir. 1995); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1997) (awarding a 5.5 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 485-486 (S.D.N.Y. 1998) (awarding a multiplier of 3.97); *Cosgrove v. Sullivan*, 759 F. Supp. 166, 169-169 (S.D.N.Y. 1991) (awarding fee equal to a multiplier of 8.84); *Rabin v. Concord Assets Group, Inc.*, 1991 WL 275757 *1-2 (S.D.N.Y. 1991) (4.4 multiplier); *In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890 (1st Cir.1985) (6 times multiplier).

[25] Indeed, it would be unfair to penalize Class Counsel by slavish adherence to a lodestar amount when they did what was clearly the best thing for the class in achieving an early settlement that preserved the ability of Class Members to obtain 100% relief from the IRS.

But again, the use of the lodestar should only be used as a rough cross-check in determining the appropriate percentage of the benefit fee.  *In re Toys R Us-Delaware, Inc.--Fair and Accurate Credit Transactions Act (FACTA) Litigation*, 295 F.R.D. 438, 460 (C.D.Cal. 2014).

However, it must be remembered that in a vigorously contested, adversarial environment, the Parties were able to reach agreement as to a reasonable fee that the defendant Bank is paying separate and apart from any class settlement money.  With the assistance of Justice Trotter, Class Counsel and the Bank considered all the factors of a percentage and lodestar fee and jointly agreed, subject to this Court's approval, that the appropriate and reasonable fee for the work put in, the risks undertaken and the results obtained was $10.5 million.  Trotter Dec., ¶ 32.  If approved, the Bank will pay this fee, in addition to all Class Counsel's costs and all administrative costs and enhancements separate from the class recovery.

## V.   COSTS

Class Counsel seek approval of $36,380 in costs which were reasonably incurred in the litigation, the majority of which are for mediation fees.  See Vendler and Brown Decs. at ¶¶ 89, and 80, respectively.

## VI.   ENHANCEMENT TO THE CLASS REPRESENTATIVE

It is well established that District courts have the discretion to award Case Contribution/Incentive Awards named plaintiffs as compensation for their actions taken on behalf of the class.  *Staton* at 327 F.3d 977.  To assess whether an incentive payment is excessive, district courts balance factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation, the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment."  *Id.*

Here, the 2 named plaintiffs are both lawyers who have spent extraordinary amounts of time on this case to the immense benefit of the class in the form of a Settlement worth many many millions of dollars. And since Ms. Gurevich works in the financial services industry, she undertook some risk to her future career by becoming a named class representative against a national bank. Gurevich Dec., ¶¶ 1 and 11. By shouldering the burdens associated with this litigation and taking on its risks, including their possible liability for costs if the litigation were unsuccessful, the class representatives have made significant contributions to the recovery obtained for the Class.

It is also important to note that the Bank has agreed to pay the enhancement awards separate and apart from the class recovery. Justice Trotter mediated this issue and with his guidance and oversight, the $25,000 awards were agreed to based on the factors generally considered for establishing such awards, but only after the class relief was set. Trotter Dec., ¶ 16.

Plaintiffs recognize that the $25,000 sum requested is above what courts generally award. See, e.g. *Pelletz v. Weyerhaeuser Co.*, 592 F.Supp.2d 1322, 1330 (W.D.Wash.2009) (approving incentive award of $7,500) and *Jacobs v. Cal. State Auto. Ass'n Inter–Ins. Bureau*, 2009 WL 3562871 (N.D.Cal. 2009) (awarding incentive payment of $7,500). But the awards the named plaintiffs are seeking are by no means unprecedented in cases where the value secured for the class has been large. $25,000-$50,000 incentive awards have been approved in many cases in the Ninth Circuit: *Singer v. Becton Dickinson and Co.*, 2010 WL 2196104 (S.D.Cal. 2010); *Louie v. Kaiser Foundation Health Plan, Inc.*, 2008 WL 4473183 (S.D.Cal. 2008); *Glass v. UBS Fin. Servs.*, 2007 WL 221862 * 16–17 (N.D.Cal. 2007); *Van Vranken v. Atl. Richfield Co.*, 901 F.Supp. at 299 (N.D.Cal.1995); *Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385 (N.D.Cal. 2011); and *Presley v. Carter Hawley Hale Profit Sharing Plan*, No. C9704316SC, 2000 WL 16437 *2 (N.D. Cal. 2000).

But the named plaintiffs are both lawyers whose time is very valuable and both have spent substantial time on this case: (a) attempting to resolve the matter with the Bank and the IRS before being forced to litigate, (b) securing qualified counsel, (c) meeting with counsel on multiple occasions in person and by telephone helping to formulate the complaint, (d) participating generally in the strategy of the litigation and reviewing all subsequent pleadings, and (e) participating in the mediations which resulted in a Settlement that, if approved, will provide tremendous relief to a class of hundreds of thousands of persons.  Horn Dec., ¶ 12-18 and Gurevich Dec., ¶¶ 13, 17, 19 and 20-27.  Based on their substantial service and the risk that they took, Justice Trotter believed the awards are reasonable (Trotter Dec., ¶ 33) and, in any event, the awards do not diminish the class recovery.  *Id.*

## VII.  **CONCLUSION**

For all the foregoing reasons, this Court should grant this motion by finally approving the Settlement, entering judgment thereon, approving payment of plaintiffs' attorneys' fees in the amount of $10.5 million dollars, and their costs in the amount of $36,380 and approving $25,000 as a service award to each of the two named class representatives.

Date: March 14, 2014                    MORRIS POLICH & PURDY LLP


By:    /s/ David J. Vendler
             David J. Vendler
       Email:    dvendler@mpplaw.com

       Additional counsel:
       MICHAEL R. BROWN, APC
       Michael R. Brown, Esq. (SBN 65324)
       Email:    mbrown@mrbapclaw.com
       18101 Von Karman Avenue, Suite 1940
       Irvine, California 92612
       Tel.:  (949) 435-3888 / Fax:   (949) 435 3801

LAW OFFICE OF JEFFREY D. POINDEXTER
Jeffrey D. Poindexter, Esq. (SBN 167854)
Email:    jeffrey@jdpoindexterlaw.com
2580 Catamaran Way
Chula Vista, CA 91914
Tel.:   (619) 271-2382 / Fax:   (619) 568-3801

Attorneys for Plaintiffs RICHARD M. HORN
and MARIA GUREVICH and all others
similarly situated